UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| OMNI ASSOCIATES, LTD, doing business as OMNI ARCHITECTS, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 24-149-DCR |
| V. | ) ) | |
| OMNI COMMERCIAL, LLC, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Omni Commercial, LLC has moved for summary judgment on all of the claims asserted by Plaintiff Omni Associates, Ltd., doing business as Omni Architects. [Record No. 43] The plaintiff has moved for partial summary judgment concerning "likelihood of confusion" liability under its Lanham Act trademark infringement claim and related state claim. [Record No. 42] After considering the parties' arguments and the materials submitted, the defendant's motion will be denied, and the plaintiff's will be granted.

## I. Background

Plaintiff Omni Associates, Ltd. is a Kentucky corporation founded in 1975. [Record No. 42-1 at 1] It began doing business as Omni Architects six years later. *Id.* The plaintiff provides architectural design and related services but sometimes engages in construction project oversight and management services. *See id.* at 1, 3, 6. The architectural firm is part of Kentucky's Architecture, Engineering, and Construction ("AEC") industry and has won various awards in the national architectural industry for its work over the last fifty years. *Id.* at 2, 15. The plaintiff registered OMNI ARCHITECTS in 2024 as a standard character mark

- 1 -

on the United States Patent & Trademark Office's Principal Register for use with "architectural design, planning, and advisory services, as well as construction feasibility services." *Id.* at 2.

Defendant Omni Commercial, LLC is a Kentucky limited liability company founded in 2016. *Id.* Its services include general contracting, design-build, and construction management services. *Id.* Like the plaintiff, the defendant operates in the Kentucky AEC industry. *See id.* However, it was unaware of the plaintiff when it named its company after "omni" references in the Bible. [Record Nos. 43-2 at 10 and 62-2 at 3] Both companies are referred to or presented as just "Omni," either in everyday speech or in their logo designs.

The parties first encountered each other in 2019 when they were contracted to work on a cafeteria renovation for Kentucky's Cabinet for Human Resources, with the plaintiff serving as the architect and defendant as the general contractor. [Record No. 42-1 at 4] The parties later worked together on the Harris Ballroom Project at the University of Kentucky. [Record No. 43-32 at 16–17] Then in 2021, the defendant oversaw a pedestrian pedway project at Eastern Kentucky University ("EKU") that was constructed six inches too low and resulted in negative publicity and a high-profile dispute concerning the construction mishap. *Id.* It was not until 2023 that the plaintiff learned that the defendant offered design-build services in addition to contracting services. *Id.*

Design-*bid*-build services differ from design-build services in a few key respects. Design-bid-build services begin with a property owner hiring an architect to design the new build or renovation through the request for proposals process. [Record No. 43-23 at 8] Once the plans have been drafted and approved by the owner, bids are solicited for the next stage of the project, which ordinarily includes selecting a general contractor. *See id.* at 9. In this model, general contractors receive information to bid on the project directly from the owner, the

architect, or through publication portals such as the EComm system offered in Kentucky by Lynn Imaging. *Id.* General contractors then hire third-party subcontractors to complete electrical, plumbing, roofing, etc. *See id.*

That process differs from the design-build model where the property owner hires a project management entity or general contractor to take the project from conception to completion, creating a single point of contact. *Id.* In this model, the project manager or general contractor partners with other entities such as architectural firms or subcontractors to bring the project to completion. *Id.*

Confusion stemming from the EKU mishap and otherwise, led Eric Zablika (the plaintiff's president) to send the defendant a letter in June 2023, explaining that the shared name was creating confusion in the AEC market. [Record No. 42-1 at 5] The defendant did not respond. So in March 2024, the plaintiff's legal counsel sent a cease-and-desist letter explaining the same. *Id.* Again, the defendant did not respond, and this action followed. *Id.*

The plaintiff brings claims for service mark infringement, unfair competition, and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); and service mark infringement and unfair competition under Kentucky common law and K.R.S. § 365.601(2) (Count II). [Record No. 1] It seeks injunctive and monetary relief. *Id.*

The defendant moved for summary judgement on both counts, arguing that the plaintiff fails to produce sufficient evidence that would allow a jury to find that there is a likelihood of confusion between the parties' marks and that the alleged infringement has a substantial economic effect on interstate commerce. [Record No. 43-32 at 11–12] And because the plaintiff cannot show a likelihood of confusion, it argues that the plaintiff's corresponding state

claim fails.  *Id.* at 24.  The plaintiff also has moved for partial summary judgment on the issue of liability concerning its Lanham Act claim.[1]  [Record No. 42-1]

## II.  The Legal Standard

Entry of summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

In a typical case, the moving party carries an initial burden to produce evidence to present a prima facie case that the movant is entitled to judgment as a matter of law.  *Celotex,* 477 U.S. at 317.  Once the moving party meets its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

However, "[w]hen a plaintiff moves for summary judgment on its own claims, for which it carries the burden of persuasion at trial, the burden is high."  *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 705 (N.D. Ohio 2024).  The plaintiff must demonstrate

---

[1] Because the standards are "functionally the same," the plaintiff also requests that it be granted summary judgement on liability concerning its state claim.  [*See* Record No. 57 at 3, n.1 (citing *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 515 (6th Cir. 2023)).]

the "absence of material fact disputes on all of the essential elements of its claim." *Id.* at 705–06 (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).  To be sure,

> [a] plaintiff-movant must present evidence that would entitle [it] to a directed verdict if that evidence were not controverted at trial.  If the [defendant responds] to the motion with controverting evidence which demonstrates a genuine issue of material fact, plaintiff's motion must be denied.  However, if, after analyzing the combined body of evidence presented by both parties, the evidence is such that no reasonable jury could find in favor of the [defendant], then summary judgment will be entered on behalf of the plaintiff-movant.

*United States v. Long*, 121 F. Supp. 3d 763, 767 (N.D. Ohio 2014) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)); *see also Viet v. Le,* 951 F.3d 818, 823 (6th Cir. 2020).

### III.  Analysis

### The Lanham Act

The Lanham Act in Title 15 of the United States Code, Section 1125(a)(1)(A), creates a civil cause of action against any person:

> [using] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.][2]

A plaintiff proves service mark infringement by demonstrating: "(1) that it owns a [service] mark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing [service] mark is likely to cause confusion among consumers

---

[2] "The deceptive practices prohibited by § 1125 have loosely been described as 'unfair competition.'"  *AutoZone, Inc. v. Tandy Corp.*, 174 F. Supp. 2d 718, 734 (M.D. Tenn. 2001), *aff'd*, 373 F.3d 786 (6th Cir. 2004) (citing *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998)).

regarding the origin of the goods offered by the parties." *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021) (internal quotations and citations omitted). Such infringement allows the defendant to "benefit from the plaintiff's goodwill without having to pay for it." *Johnson*, 149 F.3d at 502.

The likelihood of confusion element remains the "touchstone of liability" in service mark infringement and false designation claims. *Id.*; *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). "The legal conclusion that confusion is likely must rest on the particular facts of the case, but when all of the material facts have been determined, the ultimate determination of likelihood of confusion lies within the exclusive jurisdiction of the court." *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983) (citing *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443–44 (9th Cir. 1980)).

### The Kentucky Claim

A federal service mark "infringement analysis is identical to Kentucky's common law unfair competition analysis." *See Eat BBQ LLC v. Walters*, 47 F. Supp. 3d 521, 527 (E.D. Ky. 2014). The plaintiff must establish that it held service marks, the marks are valid and protectable, it did not consent to the use of those marks, and the use of the marks was likely to cause confusion. *Id.* at 527–28; *see also Winchester Federal Savings Bank v. Winchester Bank, Inc.*, 359 F. Supp. 2d 561, 564 (E.D. Ky. 2004). Ownership rights of a service mark "follow only from prior appropriation and actual use in the market." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998) (citation modified).

### (A) Protectable Mark

Service mark "ownership rights flow only from prior appropriation and actual use in the market," not mere registration of the mark. *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991) (citation omitted). However, "[r]egistration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a [service] mark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 513 (citing 15 U.S.C. § 1115(a)). To overcome this presumption, a defendant must persuasively argue that the mark was not protectable. *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir. 1989). Further, the United States Court of Appeals for the Sixth Circuit takes the position that the "registration of a composite of several words creates a presumption of validity as to a dominant part of the composite." MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:137 (5th ed.) (citing *Leelanau*, 502 F.3d at 514).

The plaintiff argues that its registered Omni mark is entitled to a presumption that it is inherently distinctive and (at a minimum) suggestive because the United States Patent & Trademark Office ("USPTO") did not require a showing of a secondary meaning during the registration process. [Record No. 42-1 at 7–9] The defendant does not appear to contest this presumption or challenge it. [*See* Record No. 62-2 at 8.] To the extent it is arguing the existence of other Omnis undermines the plaintiff's contention that its mark is distinctive, that analysis is discussed in greater depth below in the strength of the mark section. Nonetheless, the argument does not overcome the presumption that the plaintiff's Omni mark is inherently distinctive or at least suggestive.

- 7 -

Further, the portion of "OMNI ARCHITECTS" that is dominant is "OMNI" and, therefore, the plaintiff owns that service mark standing alone. Even without registration, it is undisputed that the plaintiff had been using the Omni service mark continuously for the last fifty years. [*See* Record Nos. 42-1 at 1 and 67 at 2–3.] And as discussed below, its mark possesses the requisite distinctiveness and strength notwithstanding the presumption.

### (B) Substantial Economic Effect on Interstate Commerce

Lanham Act claims require a "substantial economic effect on interstate commerce" for federal jurisdiction to attach. *See Johnson*, 149 F.3d at 502 (citing *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790, 795 (6th Cir. 1957)). And while demonstrating an effect on interstate commerce is a necessary, it is not an onerous task. *See Accelerated Analytics, LLC v. Int'l Bus. Machines Corp.*, No. 1:15 CV 401, 2015 WL 3828077, at *5 (N.D. Ohio June 19, 2015) (quoting *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952) ("The Supreme Court has held that the in commerce requirement should be construed liberally because the Lanham Act 'confers broad jurisdictional powers upon the courts of the United States.'"). In reviewing a motion to dismiss, the Sixth Circuit has held that "the very act of sending an e-mail creates the interstate commerce nexus necessary for federal jurisdiction" in a false advertising case. *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 803 (6th Cir. 2015) (citing *Doe v. Smith*, 429 F.3d 706, 709–10 (7th Cir. 2005)). Where a defendant's false designation of the plaintiff's mark hinders its ability to conduct interstate business, it "affects interstate commerce." *Id.*

In this case, the defendant argues that because the plaintiff only conducts business in Kentucky, its alleged infringing activity cannot be said to have a substantial effect on the plaintiff's ability to engage in interstate commerce. [Record No. 43-32 at 11] In support, it represents that "every client identified by Plaintiff during discovery was based in Kentucky"

and that the plaintiff lost no business because of the alleged infringement in Kentucky or otherwise. *Id.* Conversely, the plaintiff insists that the interstate commerce requirement does not require a showing of harm. [Record No. 57 at 7] It further argues that both parties have "repeatedly done business in other states under their "Omni" names and used their marks in interstate commerce," such as in email. *Id.* 7–8 (citing 15 U.S.C. § 1125(a) (section applies to marks that are "use[d] in commerce"); 15 U.S.C. § 1127 (service mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State")).

Indeed, both parties *have* done work in other states, despite the defendant's representations to the contrary concerning the plaintiff's past work. [Record Nos. 62-2 at 3 ("OMNI Commercial has done work in seven states and is licensed to do work in 31 states."), 42-1 ("Plaintiff also has done business in other states, such as Indiana[.]").] The plaintiff correctly notes that harm is unnecessary for this jurisdictional threshold. But recall that the interstate commerce requirement is not an onerous one. This is particularly true where both parties use social media and the internet to promote their services, as is the case here. Thus, this prerequisite is satisfied but even if it was not, the plaintiff's Kentucky infringement claim has no such requirement.

### (C) Likelihood of Confusion

"Whether a likelihood of confusion exists 'is a mixed question of fact and law,' but the ultimate determination of 'whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion.'" *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 731 (6th Cir. 2012) (quoting *Therma–Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630–31 (6th Cir. 2002)). To make this determination, the Court considers:

> (1) the strength of the plaintiff's mark; (2) the relatedness of the goods or services offered by the plaintiff and the defendant; (3) the similarity of the marks; (4) any evidence of actual confusion; (5) the marketing channels used by the parties; (6) the probable degree of purchaser care and sophistication; (7) the defendant's intent in selecting its mark; and (8) the likelihood of either party expanding its product line using the marks.

*Id*. (quoting *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) ("*Frisch*'s factors").   These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). Ultimately, the question for the Court is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners*, 931 F.2d at 1107.  "Relevant consumers" are potential purchasers of the junior service mark user's service.  *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 689 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (citing *Leelanau*, 502 F.3d 504).   That said, a likelihood of confusion in some cases may also involve post-sale, "downstream" confusion, affecting a company's reputation among public consumers.  *See Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 355 (6th Cir. 2006) (noting that Congress "intended to protect the reputation of the manufacturer as well as to protect purchasers").

### (1) Strength of the Senior Mark

"'The strength of a mark is a factual determination of the mark's distinctiveness.  The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due.'" *Daddy's*, 109 F.3d at 283 (quoting *Frisch's*, 759 F.2d at 1264).

**Conceptual Strength:** "When assessing its strength, a court will place a [service] mark into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary." *Id.* at 280 (citing *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116–17 (6th Cir. 1996)). "These categories constitute a spectrum of increasing strength and are not perfectly discrete." *See id.* (citing *Champions*, 78 F.3d at 1116–17). "Suggestive, arbitrary, and fanciful marks are 'inherently distinctive and are entitled to protection.'" *AWGI*, 998 F.3d at 265 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). Whereas descriptive marks are only entitled to protection with a showing of a secondary meaning. *Champions*, 78 F.3d at 1117 (citation omitted). "Assigning a category to a mark constitutes only a single step in determining the strength of the mark." *Daddy's*, 109 F.3d at 281 (citing *Homeowners*, 931 F.2d at 1107).

The parties disagree when it comes to placing "OMNI" into one of the four categories. The defendant argues that the plaintiff's mark falls between arbitrary and descriptive,[3] but the plaintiff insists its mark is arbitrary or at a minimum suggestive. [Record Nos. 43-32 at 14 and 42-1 at 11] The undersigned agrees with the plaintiff. "Omni" is a prefix meaning "all" or "universally." *Omni*, *Merriam-Webster*, www.merriam-webster.com/dictionary/omni- (last visited Dec. 17, 2025). It is unlike the descriptive marks the panel in *Champions* provided by way of example "BEST, SUPERIOR, and PREFERRED" and does not describe a characteristic or ingredient of the services offered. *Champions*, 78 F.3d at 1117 (citations omitted). Therefore, the mark cannot be said to be merely descriptive.

---

[3] The parties may not disagree considering that the generic, descriptive, suggestive, and arbitrary categories are on a "spectrum of increasing strength." *Daddy's*, 109 F.3d at 283. As such, the defendant's argument that the plaintiff's mark falls between arbitrary and descriptive appears to encompass "suggestive" in terms of strength.

"OMNI" likely falls between suggestive and arbitrary.  It may be suggestive because it "requires the observer or listener to use imagination and perception to determine the nature" of the services the plaintiff offers.  *Id.* (citation modified).  With a little thought, the observer could infer that Omni Architects provides comprehensive architectural services or architectural services in a variety of applications.  But "OMNI" could be classified as arbitrary because it "has a significance recognized in everyday life," but in no way is connected to architectural services.  As the plaintiff argues, it is even more likely to be arbitrary because it is a prefix being used as a standalone word further disconnecting it from its ordinary use and meaning. [Record No. 42-1 at 11] Either way, the mark's conceptual strength is somewhere between suggestive and arbitrary.

**Commercial Strength:** In addition to conceptual strength, the Court must also evaluate the mark's commercial strength because a mark can be "conceptually strong without being commercially strong," rendering it weak.  *AWGI*, 998 F.3d at 265 (citations and quotations omitted).  Proof that the plaintiff advertised using its mark can demonstrate commercial strength.  *Id.* "A mark's commercial strength depends on public recognition, or the extent to which people associate the mark with the [service] it announces."  *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 430 (6th Cir. 2017) (citing *Homeowners*, 931 F.2d at 1108).  While not dispositive, "advertising expenditures expose consumers to a [service] mark, increasing its public recognition."  *Id.* (citing *Kibler v. Hall*, 843 F.3d 1068, 1074 (6th Cir. 2016)).

Third-party usage of the senior user's mark which are similar and related can undermine the mark's distinctiveness.  *Daddy's*, 109 F.3d at 281 (citing *Homeowners*, 931 F.2d at 1108). However, merely identifying other similar marks is insufficient; rather, the defendant must do

more and "show what actually happens in the marketplace." *Id.* (quoting *Homeowners*, 931 F.2d at 1108). A mark "might be weak in the national market, but might still be strong in the senior user's geographical and [service] area and thus deserving of protection." *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 966–67 (6th Cir. 1987).

The plaintiff asserts that its mark is commercially strong for the following reasons: (1) it has used the mark continuously since 1975; (2) aside from the defendant, no other AEC industry partner uses the mark in Kentucky; (3) those within the industry and geographic region readily recognize the mark and associate it with the plaintiff; (4) since 2020, it has allocated over $2.4 million to marketing and advertising; (5) its net yearly earnings exceed three million dollars; and (6) its presence, reputation for excellence, and relationship with major institutions in Kentucky are well established. [Record No. 42-1 at 14–16]

Rather than contest all these claims, the defendant attacks the mark's strength by focusing on other architectural service firms that include "Omni" in their names. [*See* Record Nos. 43-32 at 14 and 62-2 at 9–10.] It notes that one, OMNI Architects (located in West Virginia), is also registered in Kentucky. [Record No. 62-2 at 9] The defendant also appears to suggest that because plaintiff's representatives testified that the "vast majority" of its clients are repeat customers, its advertising expenditures should not be afforded much weight. *See id.* It also takes issue with the plaintiff's use of employees' "self-serving" testimony that Omni Architects is widely known as just "Omni."[4] *Id.* at 10. It argues that the plaintiff has brought forth no survey or "admissible customer testimonials." *Id.* And because the plaintiff failed to

---

[4] This contention is more appropriately addressed under the similarity of the marks section. Further, the Court already determined that "Omni" was the dominate portion of the composite and, therefore, it is entitled to a presumption regarding its validity.

timely disclose these potential witnesses, it insists that Rules 26 and 37 of the Federal Rules of Civil Procedure mandate their exclusion.[5] *Id.* at n.1.  Finally, the defendant argues that the plaintiff's "only recognition is niche in nature and not worthy of 'strong mark' status." [Record No. 67 at 8]

Of course, the plaintiff disagrees.  It argues that its mark is not weakened by those other architectural firms, two of which are in other countries with the remaining operating in other states.  [Record Nos. 57 at 11 and 68 at 8–9] It further notes that the legal standard acknowledges that a "mark might be weak in the national market, but might still be strong in the senior user's geographical and product area and thus deserving of protection." [Record No 57 at 9 (quoting *Ameritech*, 811 F.2d at 967).]  Thus, what matters here is the strength of the plaintiff's mark within the Kentucky AEC industry.  *Id.* at 11.  Concerning the West Virginia OMNI Architects, the plaintiff contests the admissibility of its website's representation that it is registered in Kentucky.  [Record Nos. 57 at 12 and 68 at 3]  But notwithstanding admissibility, it insists that there is no indication that the West Virginia company has ever done work in Kentucky.  [Record No. 68 at 3]  And, in any event, a single third-party use in the relevant service and geographic market is "insufficient to meet the required evidentiary showing of <u>widespread</u> third-party use." [Record No 57 at 12 (quoting *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 557 (6th Cir. 2013) (emphasis in original)).]

---

[5] The defendant also insists that the plaintiff's narrowing of its services before the USPTO necessarily undermines the strength of the plaintiff's mark.  [Record No. 67 at 7 (citing *Homeowners*, 931 F.2d at 1107).]  The effect, if any, of the arguments the plaintiff made before the USPTO are discussed more thoroughly under factor two.

Regarding the defendant's claim that the plaintiff's advertising expenditures should not be weighed heavily because it only identified two projects that were not repeat customers, the plaintiff asserts that the defendant misrepresents the testimony.  [Record No. 68 at 5] Specifically, during the plaintiff's Zabilka's deposition, he was asked to provide two examples of non-repeat customers, not an exhaustive list as the defendant suggests.  *Id.* (citing Record No. 57-7 at 36:19-37:18, 39:18-40:2).  Responding to its alleged Rule 27 and 36 violations, it notes that, other than its one-line statement and citation to record entry numbers, the defendant has put forth no argument.  *Id.* at 9.  And therefore, it has waived its undeveloped argument. *Id.*

Omni Architects has demonstrated the absence of a dispute regarding a material fact concerning its commercial strength in its geographic region.  As an initial matter, the defendant provides no legal authority for its proposition that if the majority of the plaintiff's clients were repeat customers that somehow weakens its commercial strength or undermines its advertising expenditures.  Contrary to the defendant's suggestion, advertising dollars are properly expended to maintain and reattract existing customers—not just to procure new ones. Assuming for the sake of arguing that the plaintiff's customers had used plaintiff's services before, this in no way calls into question its commercial strength.  If anything, it supports it.

Here, the plaintiff has provided evidence that it has spent millions of advertising dollars in recent years.  As noted previously, the threshold question is the likelihood of confusion. Because advertising has the potential to expose more viewers to its mark, it increases the chance that consumers will believe the defendant and plaintiff are associated.  Consider the plaintiff's purchasing of advertisement space in "local and industry publications, such as Lexington Business First, Lane Report, and [American Institute of Architects] Kentucky."

[Record No. 43-32 at 14–15] It is immaterial whether those dollars were spent to maintain repeat customers or gain new ones because such advertisements allow the defendant to benefit from the goodwill (and visibility) the plaintiff has garnered.

The undersigned is unconvinced that the other architectural companies using the Omni mark weakens the plaintiff's. As the plaintiff correctly notes, third-party companies using the same mark are analyzed in the context of how the market actually operates. That means that Omnis in Sweden and Greece do not diminish the plaintiff's mark here. The only Omni that arguably operates within this state or region (others are in New York, Texas, etc.) is the one in West Virginia. But as plaintiff argues, assuming this Omni was in the plaintiff's geographic region, the existence of *one* third-party Omni is insufficient to show widespread use of the mark.

The same is true for the plaintiff's customers' statements concerning its recognition in the local AEC industry. Notwithstanding the defendant's undeveloped argument that they violate Rules 27 and 36, the plaintiff does not need these statements to demonstrate its commercial strength. It has offered evidence that it has used its mark continuously since 1975 in Kentucky's AEC industry, has recently allocated over $2.4 million to marketing and advertising, nets over three million in earnings on a yearly basis, and has numerous institutional clients, most of which are repeat users of its services. Supporting the plaintiff's claim that it is widely recognized for its excellence, it notes that it has won more American Institute of Architects awards than any other firm in Kentucky. [Record No. 42-1 at 15–16] In summary, the plaintiff has met its burden in demonstrating that there is no dispute as to material fact concerning the conceptual and commercial strength of its mark.

### (2) Relatedness of Services

The relatedness of goods or services are analyzed within a three-tiered system: (1) if the parties are in direct competition, then "confusion is likely if the marks are sufficiently similar"; (2) if "marks are somewhat related, but not competitive, the likelihood of confusion determination will turn on one of the other seven factors"; and (3) if the services "are unrelated, a likelihood of confusion is highly unlikely." *Leelanau*, 502 F.3d at 516 (citation modified) (quoting and citing *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 798 (6th Cir. 2004)). Services "are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* (quoting *Daddy's*, 109 F.3d at 283–84).

"The Sixth Circuit has held the following goods or services related enough to cause confusion: bulk car wash products and car wash franchises, two slightly different kinds of oxygenating septic filters and sit-down and carry-out pizza." *Maker's Mark*, 703 F. Supp. 2d at 691 (citing *AutoZone*, 373 F.3d at 797 (collecting cases)). It has held the following businesses to be not sufficiently related: "infrared thermal-imaging devices and ear thermometers, real estate brokers and marketing services for real-estate brokers and Kellogg cereal's 'Toucan Sam' trademark and a golf company named 'Toucan Golf.'" *Id.* (citing *AutoZone*, 373 F.3d at 797).

The defendant insists its services "will never intersect" those offered by the plaintiff and that the two have coexisted peacefully for nearly a decade. [Record No. 62-2 at 2, 11] It represents that it never has and never will offer architectural services. *Id.* at 26. More pointedly, it argues that before either party becomes involved in a project, the consumer would

- 17 -

have already decided whether to pursue a design-build or design-bid-build delivery method. *See id.* at 5. In the design-build process, the project owner would solicit bids for project managers or general contractors (like the defendant) that would then manage the subcontractors, and ultimately, the completed build or renovation. *Id.* at 11–12. But if the project owner preferred to use the design-bid-build method, it would first solicit bids for an architect (like the plaintiff) that would design the build or renovation. *Id.* at 12. And once the architectural design was complete, the project owner would solicit bids from general contractors to complete the project. *Id.* The defendant references the cafeteria project and the Harris Ballroom Project that the parties worked on in tandem (one as architect and the other as general contractor) as proof that the parties' respective services are distinct. [Record No. 43-32 at 16–17] Although it represents that it has never offered architectural services, it concedes that it hires third-party architects. *Id.* at 10; [Record No. 62-2 at 6].

The plaintiff argues that the services compete and overlap and that consumers are likely to believe the two are somehow affiliated. It contends that "relatedness" focuses on the consumer's perception from the parties' marketed services. [Record No. 42-1 at 17] And contrary to the defendant's representation otherwise, the plaintiff provides evidence that it does, on occasion, engage in design-build services where it oversees a project from conception to completion, much like the defendant. [Record Nos. 42-1 at 21–22 and 68 at 4–5]

Concerning architectural services, the plaintiff insists that even if the defendant does not itself provide architectural services, the fact that it contracts out the work is of no significance to the consumer because the defendant holds itself out as the provider of the service. *Id.* at 17–18 (citing *Cosmetic Dermatology and Vein Ctrs. of Downriver, P.C. v. New Faces Skin Care*, 91 F. Supp. 2d 1045, 1052 (E.D. Mich. 2000)). In support, it identifies

various marketing materials where the defendant explicitly states that it offers architectural services. *Id.* at 18–20. And because the defendant either contracts with an architect for a design or provides its client with renderings of pre-engineered metal buildings (which can be modified by the end user), it provides market substitutes for the services the plaintiff offers. [Record Nos. 42-1 at 21 and 68 at 9–10 (noting that the defendant's logo appeared on all 46 pages of the pre-engineered metal building drawings dispersed to other industry professionals for conformance review).]

Conversely, the defendant argues that because it no longer employs an in-house architect, does not provide architectural services but contracts with third parties for those services, and merely uses pre-engineered metal building drawings—such offerings are not relevant for the relatedness factor. [*See* Record No. 62-2 at 12–13.] It also insists that the plaintiff is estopped from arguing that it provides services that overlap the defendant's offerings. [*See* Record No. 62-2 at 4–5, 13.] Specifically, the defendant notes that the USPTO initially rejected the plaintiff's application because two other registered Omnis (OMNIPLAN and OMNI) provided similar services ("architectural, land-use planning, urban design and interior design services" and "[a]rchitectural design and landscape architectural design" respectively). [Record No. 62-2 at 4] Following this rejection, the plaintiff narrowed its description of services to include only "commercial, civic, and institutional architecture," and its application was subsequently approved for registration by the USPTO. *Id.* The defendant argues that this narrowing prevents the plaintiff from now arguing that the defendant's services are overlapping because the defendant is a construction firm and does not provide "commercial, civic, and institutional architecture." *Id.* at 14.

The plaintiff notes that the Sixth Circuit's position on estoppel in this context is unclear. [Record No. 68 at 11 (citing *Lucky's*, 533 F. App'x at 561).] There, the panel noted that there have been courts in other circuits unwilling to accept arguments in infringement lawsuits that are in "direct conflict" with those made before the USPTO. *Lucky's*, 533 F. App'x at 561. The panel assumed without deciding that estoppel applied but determined it was of no consequence because the arguments made before the USPTO did not conflict with those made in the infringement lawsuit. *Id.*

The plaintiff insists that the argument it made concerning its services not encompassing land-use planning or landscape architecture is not in "direct conflict" with those made presently. [Record No 68 at 11 (citing *Lucky's*, 533 F. App'x at 561).] This is so because whether the defendant offers land-use planning or landscape architecture is not in issue, and therefore, the plaintiff has no reason to argue that those offered services compete with its own. *See id.*

Assuming estoppel applies in this context, there is no direct conflict between what the plaintiff argued before the USPTO and what it argues now. Like the plaintiff asserts, if the defendant provided land use planning and architectural landscape services that the plaintiff asserted were in competition with the architectural services it offered, the defendant would potentially have a more compelling argument. But here, those arguments made to the USPTO are not relevant or in direct conflict with those made in this case.

The defendant's argument and reliance on *CEI Grp. LLC v. C.E.I. Composite Materials*, LLC, No. 19-11611, 2021 WL 534485 (E.D. Mich. Feb. 12, 2021), is unavailing. For one, that court was resolving a motion for a preliminary injunction, which is a more stringent standard than the one for summary judgment. *Id.* at *1; *McNeilly v. Land*, 684 F.3d

611, 615 (6th Cir. 2012).  In *CEI Group*, the plaintiff was a roofer who could only identify two times it installed exterior metal paneling, and the defendant was a metal wall paneling manufacturer and installer.  *Id.* at *2.  Although there was an arguable overlap of services when it came to paneling installation, the court noted that none of the plaintiff's registered marks listed this service nor did any of its advertising materials indicate that it offered this service. *Id.* at *9.  Thus, the court did not find that this factor weighed in favor of a likelihood of confusion.  *See id.*

In the present matter, both parties have provided and advertise that they offer architectural services.  [*See* Record No. 42-1 at 19–20 (providing excerpts of the defendant's advertising collateral that explicitly states it provides "Architectural services").]  Even if that were not the case, the services offered by the parties are sufficiently related, recall that "bulk car wash products and car wash franchises, two slightly different kinds of oxygenating septic filters and sit-down and carry-out pizza" were held to be sufficiently related.  *Maker's Mark*, 703 F. Supp. 2d at 691 (citing *AutoZone, Inc.*, 373 F.3d at 797).

Under the facts presented, there is a likelihood of confusion as consumers researching their next build or renovation could come across both companies and assume they are affiliated because they both operate in the same industry and state and use the same mark.  Such a consumer could believe that OMNI Commercial simply offers more wholistic services than Omni Architects as this is how some affiliated companies function.  As a result, the defendant could attract customer inquiries even *before* customers decide whether to do a design-build or design-bid-build model, considering that the defendant advertises that it offers both.

The defendant attempts to argue that comparing the two companies is not apples to apples (as the plaintiff suggests), but in so arguing, the framework it presents is fruit to apples

- 21 -

(defendant offering the fruit with plaintiff offering the apples). It seems to believe that because it offers something broader (albeit encompassing the services plaintiff offers) its services do not compete or overlap the plaintiff's offerings. But such an argument belies common sense and the way things operate in the marketplace.

Consider this hypothetical: tomorrow a Kentucky company opens in the AEC industry called "Omni Consolidated." That company offers financing for builds and renovations *and* offers general contractor services, but under the defendant's line of reasoning, Omni Consolidated would not offer related goods or services to its own. What's more, the presence of Omni Consolidated would not create a likelihood of confusion that the two (or three) Omnis were somehow affiliated. Surely not.

Here, we have two companies in the same industry and state, competing for the same customer base (those seeking a new build or renovation) with both offering architectural services. *Progressive Distribution*, 856 F.3d at 432 (noting that the relevant inquiry for relatedness considers whether the parties compete for the same customer base); *AWGI*, 998 F.3d at 266 (6th Cir. 2021) (affirming lower court that found companies "competitive because they were engaged in the same industry and served common customers"). Additionally, they both offer design-build services.[6] The litigants here directly compete or, at a minimum, offer overlapping services.

---

[6] That the plaintiff seldom engages in this service model (or abandoned a business plan to expand this service) is not material because the focus is on the likelihood of confusion, not harm as the defendant suggests. For example, a former customer of the plaintiff that used the design-build service could share that information with a potential client who then believes that former customer is referring to the defendant because of the overlap in services. It is also immaterial whether the bulk of the defendant's work is design-bid-build, not design-build.

### (3) Similarity Between Marks

The "'most important *Frisch* factors' are similarity and strength of the mark." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (quoting *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002)). "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283 (citing *Wynn Oil*, 839 F.2d at 1188). "[C]ourts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (citation and quotations omitted) (citing *Wynn Oil*, 839 F.2d at 1188)). "Moreover, courts must view marks in their entirety and focus on their overall impressions, not individual features." *Id.* (citing *Homeowners*, 931 F.2d at 1109; *Little Caesar*, 834 F.2d at 571).

The plaintiff argues that this factor supports a likelihood of confusion because the parties use the same dominate word "Omni." [Record No. 42-1 at 23 (citing *AWGI*, 998 F.3d at 266 ("Atlas Movers" and "Atlas Trucking" held similar due to "Atlas" commonality); *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015) (finding "BMF" and "BMF Wheels" to be "nearly identical" due to BMF "being dominant identifier as the non-generic element of the composite")).] It insists that the generic words "Architects" and "Commercial" fail to meaningfully distinguish the marks and that no reasonable juror could find otherwise. *Id.* at 23–24. Further, both parties are known as just "Omni," with the defendant using the word alone in its logo and the plaintiff being referred to colloquially as just "Omni" within the AEC industry. *Id.* at 24 (citing *Daddy's*, 109 F.3d at 283 ("The failure

to fully consider 'Daddy's' alone was especially detrimental…. The common propensity to abbreviate names can contribute to a finding of likely confusion when parties drop qualifying words, leaving only the confusingly similar root terms.") (cleaned-up)).  And because both parties' garner business by word-of-mouth, the likelihood that the speaker would reduce the companies to "Omni" is heightened, increasing the risk of confusion.  [Record No. 68 at 12]

 

In addition to the shared dominant word, the plaintiff contends that the parties' logos both "visually center on the same dominant term (Omni)," which causes viewers to leave with that impression rather than the other descriptive words.  [Record No. 42-1 at 25] It argues that the defendant's use of hexagons in its branding collateral further contributes to confusion because of their visual similarity to the cube in the plaintiff's logo.  *Id.*

Again, the defendant relies on *CEI Group* in arguing that the marks are dissimilar. [Record No. 67 at 9–10 (citing 2021 WL 534485 at *9).]  To support this argument, it provides a side-by-side comparison of the dueling CEI logos and asserts that they are more similar than the parties' Omni logos.  *Id.*  Regarding the cube and hexagon comparison, the defendant represents that it never uses hexagons in conjunction with its logo and that no reasonable viewer could conclude the following advertisement materials originate from the same source. *Id.* at 10 (providing side-by-side); [Record No. 62-2 at 16] ("[T]he hexagon features [present]

in some of OMNI Commercial's marketing materials do not appear directly in connection with its name or logo.").




Comparing the two logos, the defendant focuses on the rounded border in its logo and the descriptive text below OMNI as factors that distinguish it from the plaintiff's logo. [Record Nos. 43-32 at 24–25 and 62-2 at 15] Identifying more differences, it notes that the plaintiff's logo uses a yellow cube. [Record Nos. 43-32 at 24 and 62-2 at 15]. It further provides that confusion is unlikely as it (like plaintiff) includes its logo on all customer communications (but also acknowledges that much of its business comes from word-of-mouth referrals). *Id.* at 15–16.

The plaintiff challenges the defendant's representation that it never used hexagons in conjunction with its logo by providing a larger crop of the marketing material the defendant referenced. [Record No. 68 at 7 (citing Record No. 42-32 at 68 and referencing several other instances in promotional materials where hexagons are used alongside the defendant's logo).]




It further insists that the defendant's side-by-side comparison of the logos' features and the parties' full names violates the anti-dissection rule by ignoring the dominate feature "Omni." [Record No. 57 at 16–17]

The defendant's reliance on *CEI Group* is misplaced. There, the court focused on the fact that the defendant used its full name "CEI Materials" in its logo and rarely used "CEI" like the plaintiff—not the appearance of the logos side-by-side. 2021 WL 534485 at *10. But here, the defendant's own logo drops "Commercial" in favor of just "OMNI." Contrary to the defendant's suggestion otherwise, the court in *CEI Group* held that this factor *did* weigh in favor of confusion, albeit slightly. *Id.* And as the plaintiff urges, the Sixth Circuit cases the defendant cites to argue a lack of similarity are inapposite to the present facts for the reasons discussed by the plaintiff. [*See* Record No. 57 at 17.]

In this case, the defendant cannot escape the fact that both marks use the dominate term "Omni." The various differences between the logos are of no consequence here. This is especially true because the parties admit that both rely heavily on word-of-mouth referrals. The average speaker would seldom refer to the companies as "Omni Architects" and "OMNI Commercial" but instead would frequently drop the second word, particularly if that speaker

was unaware that there were two Omnis or believed them to be affiliated. This propensity is further emphasized in the parties' logos, both of which emphasize the word "Omni." This factor supports a likelihood of confusion because these marks are not just similar but identical with respect to the dominant portion. *AWGI*, 998 F.3d at 266 (explaining courts may "permissibly assign more weight to the dominant features of the marks"). The defendant's use of hexagons, while not necessary, further increases that likelihood.

### (4) Actual Confusion

A "successful Lanham Act plaintiff only must show a *sufficient potential* of confusion, not *actual* confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent." *Daddy's*, 109 F.3d at 284 (emphasis added). That said, "'[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion.'" *Id.* (quoting *Wynn Oil*, 839 F.2d at 1188). Because securing evidence of actual confusion is so difficult, "a lack of such evidence is rarely significant, and the factor of actual confusion "'is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.'" *Id.* (quoting *Wynn Oil*, 839 F.2d at 1188). However, "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite." *Id.* (citing *Homeowners*, 931 F.2d at 1110; *cf. Champions*, 78 F.3d at 1120 (stating in dicta that "four incidents [of actual confusion] is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion")).

In addition to numerous incidents of actual confusion involving those outside of the AEC industry, the plaintiff referenced the following list of actual confusion among those within it:

1. Chase Jones (Lexington–Fayette Urban County Government) called Plaintiff about grease-trap permitting for a specific project after seeing "OMNI" signage; Plaintiff's Ari Sogan told him it was not Plaintiff's job and that he was likely seeking Defendant.

2. Lynn Imaging's "eComm" system, which both parties use to pursue and follow projects, sent 32 emails to Defendant's Chad Miller regarding matters for one of Omni Architects' projects, having misidentified Defendant as the architect on the projects.

3. Alex Short (architectural designer at RossTarrant) asked Plaintiff's Brittany Leneave about a project he believed Plaintiff was doing (a hospitality job in Eastern Kentucky); after discussion, they ultimately determined he had mistaken Plaintiff for Defendant.

4. Sarah Bosmans (Project Design Coordinator in architectural and engineering plans for the Commonwealth of Kentucky) asked Plaintiff's Janette Marmo in the car after passing Defendant's "OMNI" signage if that was her employer and whether it was Plaintiff's job; Marmo explained that the sign was Defendant's.

5. Gary Burns (EKU Procurement and selection committee member) asked EKU's Bryan Makinen during the Campus Master Plan architect selection process if Plaintiff was the entity involved in the pedway dispute; Mr. Makinen testified that he "clarified that it was Omni Architects [that submitted a bid] and not Omni Commercial."

6. Christian Kerr (David H. Elliot Company, an electrical subcontractor) emailed Plaintiff asking if it planned to bid on a specific renovation project; he then acknowledged, after clarification from Plaintiff's Eric Zabilka, that it was Defendant whom he should be trying to reach.

7. Scott Brown (Johnson Controls), who was the Lead System Specialist over controls for the HVAC equipment on the EKU pedway project, contacted Plaintiff for updates. When told he had the wrong Omni, Brown would not relent, sending a news photo of Defendant's truck with the "OMNI" logo and asking pointedly if that was Plaintiff's truck.

8. A Project Manager for the Commonwealth of Kentucky's Parks and Recreation Capital Projects Group told Plaintiff's Chad Gallas that he'd worked with Plaintiff ("Omni") on certain Parks projects; because Plaintiff had done no such projects, Gallas understood the person to be confusing Plaintiff with Defendant.

9. Tim Ernst (facilities maintenance and management for Aramark, which was contracted by EKU) told Plaintiff's Amy Arnold that Plaintiff caused problems on the EKU pedway construction project, which he called a "huge disaster"; Arnold went back and forth with Ernst, explaining that it was not Plaintiff's project.

10. Angela Walton (UK's Capital Construction Project Manager) mistakenly emailed Plaintiff's Jody Boelhauf regarding questions from Defendant's Joseph Isaacs regarding an Invitation to bid for a specific project.

11. A member of the EKU architect selection committee for a multi-million-dollar project initially sought to eliminate Plaintiff's proposal because he thought Plaintiff was responsible for Defendant's pedway disaster; EKU's Bryan Makinen corrected the confusion.

12. A caller phoned Plaintiff about a project that "Omni" had done, which Plaintiff's Ryan Moore determined was not one of Plaintiff's projects; after the call, Moore confirmed via Defendant's website that it was one of Defendant's projects.

13. A subcontractor approached Plaintiff's Jody Boelhauf (wearing an Omni Architects hard hat) at Kentucky State University's Atwood project about a project that was not Plaintiff's; Boelhauf understood this as confusion with Defendant and its work on the referenced project.

14. During the renovation of the Cabinet of Human Resources cafeteria, a project on which both Plaintiff and Defendant worked, despite efforts from Plaintiff to use the full names of both companies to avoid confusion, there were still numerous instances of confusion between the two on the project, particularly since Defendant generally referred to itself as "Omni."

15. Commonwealth of Kentucky employees who were working in the building being renovated assumed that Defendant employed Plaintiff's Mark Manczyk due to his Omni Architects hard hat.

16. An owner's representative for one of Plaintiff's projects told Manczyk he saw one of Plaintiff's "Omni" signs on the interstate; Manczyk explained that the sign was Defendant's.

17. A construction trade/subcontractor to a general contractor called Plaintiff referencing a project Plaintiff wasn't involved with; Plaintiff's Deborah Cutts responded that the person was seeking Defendant.

18. Seven different industry partners inquired regarding whether the two Omnis were related or affiliated.

[*See* Record Nos. 57 at 18–20 (edited for brevity and clarity) and Record No. 68 at 14 (tallying over 80 instances of customer confusion).]

The defendant insists that where the two companies have co-existed in the same industry for nearly a decade, isolated instances of customer confusion should be afforded little weight as they are *de minimus* evidence. [Record Nos. 43-32 at 26–27 and 67 at 11] Further, because the plaintiff identifies no instance where it lost business resulting from confusion, this factor favors the defendant. *Id.* at 27. The defendant challenges the instances of confusion offered by the plaintiff, claiming they are immaterial because they involve "(1) irrelevant consumers; (2) misdirected emails, (3) Plaintiff-labeled supposition without any indication of confusion, or (4) passing conversations." [Record No. 62-2 at 18]

Regarding irrelevant customers, the defendant argues that some of the confused are individuals who would not be deciding whether to hire either company. *Id.* at 19. And as for misdirected emails, it contends that they "show mere inattention and are nominal when considering the vast quantity of emails Plaintiff receives." *Id.* It challenges the phone calls that the plaintiff cites, claiming any purported confusion was speculative on the plaintiff's employees' part. *Id.* at 19. Finally, the passing conversations are of little consequence either because they did not involve relevant customers or any confusion was promptly corrected. *Id.* at 20.

The plaintiff disagrees and notes that "there is 'no requirement that evidence of actual confusion, to be relevant, must be confusion at the point of sale—purchaser confusion—and not the confusion of nonpurchasing, casual observers.'" [Record No. 68 at 14 (quoting *Champions*, 78 F.3d at 1119 (citation modified).] Concerning the confusion being quickly corrected and therefore inconsequential, it notes that this circular argument "fundamentally misunderstands confusion evidence and the very nature of confusion itself." [Record No. 57 at 21] The only reason those instances were easily corrected was because the plaintiff was made aware of the confusion; this does not somehow negate that instances of actual confusion indicate a likelihood of confusion under this factor. *Id.* It further insists that it has brought forth more than ample evidence showing actual confusion. *Id.* at 22–23.

The undersigned agrees with the plaintiff. The instances of confusion are proportionally vaster than those in *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635–36 (6th Cir. 2002). The same is true for *CEI Group w*here the court considered two emails that were sent to the wrong company, a bid that was also sent to the wrong company, and the wrong company's address being listed in a bidding system as qualifying as actual confusion. 2021 WL 534485, at *7. It is true that the court ultimately determined them to be isolated incidents that did "not particularly weigh in favor of a finding of likely confusion." *Id.* The plaintiff here offers much more evidence of actual confusion. Therefore, *CEI Group* does not save the defendant.

As the plaintiff points out, the known instances of actual confusion represent a much larger pool of actual confusion. As the adage goes, "there's never just one cockroach in the kitchen." And although the plaintiff need not show harm, it does contend elsewhere that such confusion is problematic as the defendant is usurping its would-be customers and the

defendant's quality of work (as was the case in the EKU pedway mishap) is discouraging plaintiff's potential customers from pursuing its services by believing the two are affiliated.

This case is unlike one involving a simple point-of-sale transaction. And because the Sixth Circuit extends the likelihood of confusion inquiry beyond the point of sale to post-sale, "downstream" confusion, the Court properly considers both when applicable. *See Keystone*, 453 F.3d at 355. Stated another way, for the likelihood of confusion inquiry, it is immaterial whether that confusion occurs before a consumer reaches out to either company, while a consumer is negotiating pricing and scope-of-work, at the time the contract is signed, while the project is in process, or once it is completed. Worth noting is that the latter two periods of potential confusion happen downstream, reaching beyond the contracting parties and involving the public (including industry partners) who may see the companies' signs or equipment on site or encounter the completed work or publicity concerning it and confuse the two. Downstream confusion is more likely, longstanding, and potentially problematic here because new buildings are intended to last decades and are thrust in the public eye by virtue of their inherently large and fixed nature.

Thus, the instances the plaintiff provides of actual "downstream" confusion that the defendant deems "irrelevant" are relevant. The court in *Hydrojug, Incorporated v. Five Below, Incorporated* faced a similar situation and determined that the defendant's infringement confused customers *and* "wrought significant damage to [the plaintiff's] overall brand perception and consumer opinion about [the plaintiff's] trustworthiness and reliability." 625 F. Supp. 3d 684, 708 (N.D. Ohio 2022). And the fact that the instances of actual confusion were "easily corrected" is immaterial. What matters is that these instances exist and are not *de minimis* or isolated, which supports a likelihood of confusion.

- 32 -

### (5) Overlap of Marketing Channels

Where "both companies target the same potential customers and utilize many of the same marketing outlets, the marketing channel factor weighs in favor of likelihood of confusion." *AutoZone, Inc. v. Tandy Corp.*, 174 F. Supp. 2d 718, 730–31 (M.D. Tenn. 2001), *aff'd*, 373 F.3d 786 (6th Cir. 2004); *see also AWGI*, 998 F.3d at 267. The greater the overlap, the higher the risk of confusion. *Kibler*, 843 F.3d at 1079.

Both parties agree that they share the same marketing channels, kinds of customers, and solicit their services through the same networks.[7] [*See* Record Nos. 42-1 at 28–29, 43-32 at 27, 62-2 at 22–23, and 67 at 12–13.] However, the defendant argues that, because "neither party represents itself to be offering the others' services" and both include their respective logos on collateral at the point of sale, confusion is unlikely. [Record No. 62-2 at 22 (citing *Keystone*, 453 F.3d at 355, 357.] The plaintiff insists that *Keystone* is distinguishable for two reasons: (1) the defendant does not purport to provide its clients with a disclaimer that it has no affiliation with the plaintiff (as was the case in *Keystone*), and (2) this case involves point of sale confusion *and* other forms of confusion. *Id.* (citing Record No. 57 at 22–25).

The defendant concedes the parties' marketing channels are nearly identical. And its reliance on *Keystone* for its point-of-sale argument does not save it. Notwithstanding the fact that this is more than a point-of-sale case (discussed in greater depth in factor four), the mere existence of the parties' logos on email communication or otherwise does not rise to the level of the disclaimer in *Keystone*. 453 F.3d at 355 ("THESE REPLACEMENT PARTS ARE

---

[7] Despite the defendant's misleading heading, "The marketing channels factor is neutral because the parties' customers are similar, but their marketing approaches are different," the content of that section outlines the ways the marketing approaches are the same. [*See* Record No. 43-32 at 27.]

NOT MANUFACTURED BY THE ORIGINAL MANUFACTURER.  THESE PARTS ARE REPLACEMENT FOR THE OEM PARTS, AND MANUFACTURED IN TAIWAN FOR NORTH AMERICA MARKET.").  This factor supports a likelihood of confusion.

### (6) Purchaser Care

Courts consider the "typical buyer exercising ordinary caution" when assessing the "likelihood of confusion to the public."  *Daddy's*, 109 F.3d at 285.  But "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper."  *Id.*  Likewise, "when services are expensive or unusual, the buyer can be expected to exercise greater care in [his or] her purchases."  *Id.*  "The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors."  *Id.* (citing *Little Caesar*, 834 F.2d at 572).

While the "likely degree of purchaser care" factor is given substantial weight, it cannot alone override a strong mark and significant similarity between the marks.  *See Maker's Mark*, 679 F.3d at 424 (citing *Gray*, 295 F.3d at 646).  If "the marks are not very similar, then even a high degree of purchaser care will decrease only slightly the already low likelihood of confusion."  *Id.*  But if "the marks are quite similar, then purchaser care will decrease the likelihood of confusion only minimally because the care and skill which a purchaser will have used" in making a purchase "will not have necessarily extended to his decision regarding which" service to purchase.  *Id.*; *see also Bliss Collection*, 82 F.4th at 513.  Stated differently, "confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the [service] that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party."  *Id.*; *see also AWGI*, 998 F.3d at 268 (noting where "marks are

functionally identical" then "the degree of purchaser care has little to no impact on the resolution of the case").

The defendant argues that purchasers of the litigants' services are sophisticated and that the significant cost and time needed to complete those services indicate that confusion is unlikely. [Record No. 43-32 at 27–30] The plaintiff takes a more nuanced approach and asserts that design and build services are staged purchases with varying degrees of consumer care at each step. [Record No. 42-1 at 33–34] It further argues that, while some purchasers are sophisticated or committee based, there are others who lack specialized knowledge and are acting alone. *Id.* at 31–32 (citing *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1448 (S.D. Ohio 1990) and 3 McCarthy On Trademarks & Unfair Competition § 23:100 (5th ed.) for the proposition that a court should focus on the least sophisticated buyers in this analysis); [Record No. 57 at 25–26]. In any event, it insists that the parties' similar name and the companies not engaging in merely point-of-sale transactions caution against this factor impacting the resolution of the case. [Record No. 57 at 27 (citing *AWGI*, 998 F.3d at 268).]

To understand the significance of the degree of purchaser care, this factor must be considered in relation to the other factors. *Daddy's*, 109 F.3d at 285. The parties' services are costly, which ordinarily points to a greater degree of purchaser care. The defendant has offered evidence demonstrating there are sophisticated purchasers of the litigants' services. Viewed in a vacuum, the high price point and sophisticated purchasers[8] point to a high degree of purchaser care. However, this case involves point-of-sale *and* downstream confusion. And

---

[8] While the plaintiff concedes that some of its clients are sophisticated purchasers, it does not agree that all are sophisticated. It contends that the Court should look to its least sophisticated purchaser when making this inquiry. But that is not necessary here as the other factors' relationship to this one caution against affording it great weight.

- 35 -

because this factor focuses on the point of sale, it is "generally inapplicable to downstream confusion." *Keystone*, 453 F.3d at 357. Thus, the defendant's argument that only the sophistication of point-of-sale consumers may be considered for this factor is unavailing.

Additionally, as here, where the marks are so similar, there is a greater risk of confusion even with a high degree of purchaser care. *Maker's Mark*, 679 F.3d at 424 (explaining that this factor cannot alone override a strong mark and significant similarity between the marks). As discussed previously, the parties both use the word "Omni" in their names; emphasize the dominant word "Omni" in their logos; and due to common speech patterns, the average speaker would drop "Architects" and "Commercial" from their names and refer simply to the companies as "Omni." Because the plaintiff demonstrated the strength of its mark, the similarity between the marks, and this case involving downstream confusion, the degree of purchaser care factor is neutral.

### (7) Intent in Selecting the Mark

Circumstantial evidence of a defendant's intent to divert business away from the plaintiff is "sufficient when direct evidence is unavailable (as it often is)." *Kibler*, 843 F.3d at 1081 (citing *Daddy's*, 109 F.3d at 286; *Therma-Scan*, 295 F.3d 623, 638–39 (6th Cir. 2002)). Evidence that a defendant knew of the plaintiff's mark while using that same mark "constitutes such circumstantial evidence." *Id.* (citing *Daddy's*, 109 F.3d at 286–87). Where "there is no evidence that the defendant actually knew that a protected [service] mark existed, such knowledge can be presumed if evidence exists of the plaintiff's 'extensive advertising and long-term use of a protected mark.'" *Therma–Scan*, 295 F.3d at 639 (quoting *Daddy's*, 109 F.3d at 286). "[A] lack of intent has no effect on the determination of likelihood of confusion." *Kibler*, 843 F.3d at 1081.

There is no evidence of the defendant's intent to divert services from the plaintiff when it chose its Omni name.  [*See* Record Nos. 43-32 at 30 and 57 at 27.]  Despite the plaintiff conducting business for over forty years in the same geographic region and industry, the defendant insists that it did not know about the plaintiff before starting its company.  [Record Nos. 42-1 at 34 and 43-32 at 30] It did, however, learn of the plaintiff three years after the defendant started its business, but continued to use the mark.  Notwithstanding the defendant's stated lack of knowledge, the plaintiff has produced evidence and testimony that it spends a greater percentage of its revenue on advertising than its counterparts.[9]  [Record No. 42-1 at 15 (noting its expenditures are greater than 30% higher than the industry average).]  This coupled with the plaintiff's longstanding use of the mark is such that knowledge *could* be presumed.  *See Therma–Scan*, 295 F.3d at 639 (citing *Daddy's*, 109 F.3d at 286).  Nonetheless, the plaintiff agrees with the defendant that there is no present evidence of ill intent.  Therefore, this factor is neutral.

### (8) Possibility of Market Expansion

If there is a "'strong possibility' that either party will expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing."  *Homeowners*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & comment c (1938)).  Under this factor, "a geographic expansion or an increase in the types of products or services offered can be relevant."  *Daddy's*, 109 F.3d at 287 (citing

---

[9]  The plaintiff reserves the right to introduce evidence and make arguments should new evidence come to light indicating the defendant was aware of the plaintiff when it began its business.  [Record No. 34–35]  It does not concede that the defendant's continued use of the mark after the plaintiff's cease and desist letters and lawsuit was done without bad faith.  *Id.* at 35.

*Homeowners*, 931 F.2d at 1112).  Where litigants already compete through offering identical or overlapping services, this factor is neutral.  *AWGI*, 998 F.3d at 268; *Hydrojug*, 625 F. Supp. 3d at 712.  Much like the seventh factor (defendant's intent), "'an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary.'"  *Id.* (quoting *Champions*, 78 F.3d at 1122).

Although the parties dispute in which direction this factor points, where, as here, the Court finds that parties compete through offering identical or overlapping services, this factor is neutral.  *AWGI*, 998 F.3d at 268; *Hydrojug*, 625 F. Supp. 3d at 712.  But even if this were not the case, the plaintiff presents testimony concerning its plans to expand services into other states such as Georgia and Mississippi.  [Record No. 42-1 at 35] Likewise, the defendant indicates that it currently holds permits to conduct business in thirty states and is in the process of obtaining licenses to practice in the remaining states.  *Id.*; [Record No. 67 at 14].  Thus, this factor at a minimum, is neutral.

### (D) State Law Claim

Kentucky Revised Statutes Section 365.601 establishes the framework for trademark infringement claims.  It uses the same "likelihood of confusion" analysis as the Lanham Act.  Therefore, the plaintiff is also entitled to summary judgment on liability for its state claim.  *See Eat BBQ LLC*, 47 F. Supp. 3d at 527 (noting that the infringement analysis is identical under the federal and Kentucky statutes).

### IV. Conclusion

The ledger leans heavily toward a likelihood of confusion.  The plaintiff has discharged its burden by demonstrating the lack of dispute as to any material fact "on all of the essential

elements of its claim." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 705–06 (citing *Surles*, 678 F.3d at 455–56). No reasonable juror could find that the defendant's use of the plaintiff's mark does not create a likelihood of confusion under the *Frisch*'s factors. Although the *Frisch*'s factors imply no mathematical precision, three are neutral with the remaining five landing solidly in the plaintiff's favor. Still, if there is any remaining doubt after applying the likelihood of confusion test, it must be resolved against the junior user which has "an affirmative duty to avoid confusion" when entering the market. *See WSM*, 709 F.2d at 1086 n.1 (citations omitted); *see also P.T.C. Brands, Inc. v. Conwood Co. L.P.*, 887 F. Supp. 963, 973 (W.D. Ky. 1995) (quoting *WSM*). The Court finds no doubt, but if that were not the case, the likelihood of confusion analysis would further tip in the plaintiff's favor.

Omni Architects has been in the AEC industry in Kentucky for fifty years. Roughly forty years into that enterprise, OMNI Commercial commenced operating in the same region and industry, representing that it knew nothing of Omni Architects. Notwithstanding that lack of knowledge, it is undisputed that in 2019 (three years after the defendant launched), it was aware of the plaintiff's firm. But rather than modify its name or branding, it stayed course. To be sure, there is no current evidence that the defendant intended to infringe the plaintiff's mark, but knowledge is unnecessary for the Lanham Act or Kentucky infringement claims.

This case is a cautionary tale for entrepreneurs embarking on a new endeavor. Here, the defendant could have conducted a simple internet search for other "Omni" users that could confuse consumers before selecting its mark. It would likely have found the plaintiff. It also could have searched for other Omnis on the Kentucky Secretary of State website when it registered its LLC in 2016. In the internet age, these are simple actions that are free and available to all with only a few mouse clicks. Companies cannot save themselves from

infringement lawsuits by choosing willful blindness. And once the defendant's eyes were opened and it learned of the plaintiff's shared name but did nothing. Instead, it proceeded at its own peril regardless of whether it believed its mark to be infringing.

Just as companies are forbidden from entering the storehouses of their competitors to pilfer goods or trade secrets, they may not take other's names or likeness, functionally hitching a ride on senior users' coattails and reaping the goodwill diligently garnered over the years. While seemingly abstract when compared to tangible taking, the result for the senior user is the same, particularly when it comes to a resulting loss of business caused by confused consumers. Consider what happens to the senior user's good name when the junior user blunders, creating a risk that the failure is attributed to the senior user. This reason and others are why the Lanham Act and other state laws forbid such infringement.

Undergirding these statutes is the fundamental idea that individuals are entitled to keep that for which they have built, fought, and toiled—whether tangible or abstract (as is increasing in our ever-digital world). *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006) (noting a fundamental purpose of trademark law is to protect the trademark holder's property interest in the mark) (citing *Ameritech*, 811 F.2d at 964). Aside from that aim, the law attempts to prevent "consumer confusion and deception in the marketplace" so that "consumers know what they are purchasing and can make informed decisions." *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 843 (W.D. Ky. 2021) (citing TRADEMARK PROTECTION IS CONSUMER PROTECTION, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 2:22 (5th ed.)).

Based on the foregoing analysis, it is hereby **ORDERED** as follows:

1.    Defendant Omni Commercial, LLC's motion for summary judgment [Record No. 43] is **DENIED**.

2.    Plaintiff Omni Associates, LTD's, doing business as Omni Architects', partial motion for summary judgment [Record No. 42] is **GRANTED**, consistent with this Memorandum Opinion and Order.

Dated: December 18, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky